IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EDITH BLANK )<br>)<br>    et al. )<br>)<br>)<br>    Plaintiffs, )<br>)<br>    v. )<br>)<br>THE ISLAMIC REPUBLIC OF IRAN )<br>)<br>)<br>    Defendant. ) | Case No. 19-cv-3645 |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO TAKE JUDICIAL NOTICE OF EVIDENCE IN PRIOR RELATED CASES AND FOR ENTRY OF DEFAULT JUDGMENT AS TO LIABILITY AND DAMAGES**

Plaintiffs in this case are close family members of service members assigned to the United States Air Force Base in Dhahran, Saudi Arabia, in 1996 who were injured there in a terrorist attack materially supported and planned by Defendant the Islamic Republic of Iran. This was the "Khobar Towers" terrorist attack, named after the residential complex where the service members were housed.

The four plaintiffs who submit this Motion and Memorandum in Support are as follows: Plaintiff Edith Blank is the mother of servicemember Charles Blank, who was awarded damages in *Akins v Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (BAH). Plaintiff Christine Cramblett is the sister of Charles Blank. Plaintiff Judith MacKenzie is the mother of servicemember Nicholas Mackenzie, who was also awarded substantial damages in the same case; and plaintiff David MacKenzie is the brother of Nicholas Mackenzie.[1]

---

[1] Undersigned counsel has been unable to contact Plaintiff Jim Gaydos despite repeated attempts over an extended period of time, and undersigned counsel cannot submit a Declaration or Motion

1

I. **PLAINTIFFS HAVE PROPERLY SERVED IRAN, AND IT HAS FAILED TO APPEAR AND IS IN DEFAULT.**

Plaintiffs have complied with all requirements for service on Defendant the Islamic Republic of Iran under 28 U.S.C. Section 1608(a), which provides for service on a foreign sovereign and its political subdivisions in one of four ways. The first two, by (1) "special arrangement for service between the plaintiff and the foreign state," and (2) "in accordance with an applicable international convention on service of judicial documents," are inapplicable here.[2] Section 1608(a)(3), requiring attempted service "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," was attempted here. ECF Docket # 10 (showing transmission by certified mail, return receipt requested, of all required materials to the head of the Ministry of Foreign Affairs of Iran).

If service cannot be made pursuant to any of the first three subdivisions of Section 1608(a), after the lapse of at least 30 days, subdivision (a)(4) of that provision authorizes

---

on Mr. Gaydos' behalf at the present time. Undersigned counsel has decided that further delay may prejudice the claims of the four other plaintiffs and has accordingly submitted this Motion with accompanying Declarations on their behalf at this time. If undersigned counsel hears from Mr. Gaydos within a reasonable time frame, and Mr. Gaydos affirms that he wishes to proceed as a Plaintiff and submit a sworn Declaration, plaintiff Gaydos will, if the Court permits, submit a supplemental filing. The four moving Plaintiffs request the Court to proceed with its consideration of their Motion regardless, and to enter a final Judgment and Order with respect to them in the ordinary course of the Court's deliberation, regardless of whether Mr. Gaydos re-enters into communication with undersigned counsel.

[2] This Court has repeatedly so held. E.g., *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 78 (BAH)(D.D.C. 2017) (BAH) ("Defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service….")

"diplomatic service" by requesting the Clerk of the Court to send two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when papers were transmitted." After the lapse of more than 30 days, the Clerk in this case did transmit the required papers to the State Department. ECF Docket #14. The State Department has sent to the Clerk of the Court a letter attesting to transmission of the required papers through diplomatic channels pursuant to 28 U.S.C. 1608(a)(4), and a certified copy of the diplomatic note attesting to transmission of those papers to the Foreign Minister of Iran on July 14, 2020. ECF Docket #15.

Accordingly, the requirements for service on defendant Iran of Section 1608 of the Foreign Sovereign Immunities Act have been satisfied. Pursuant to 28 U.S.C. Section 1608(d), defendants had sixty days after service was effected to answer or otherwise respond. That time lapsed on September 12, 2020, with no response to this date. By failing to respond, Defendant is in default. The Clerk of the Court entered a default in this case on December 1, 2020. ECF Docket # 17.

Service under the FSIA is sufficient to establish personal jurisdiction over defendant. "The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U S.C. Section 1330 (a). "Personal jurisdiction over a foreign state shall exist as to every claim of relief over which the

district courts have jurisdiction … where service has been made under [Section] 1608 of this title. " 28 U.S.C. Section 1330(b).

Here, as described above, service was successfully accomplished pursuant to Section 1608(a)(4).  Therefore, the Court has personal jurisdiction over defendant Iran. See also, e.g., *Cohen v. Islamic Republic of Iran,* 238 F.Supp.3d 71, 81 (D.D.C. 2017)  ("Personal jurisdiction over foreign states exists as long as the Court can exercise original jurisdiction under 28 U.S.C. § 1330 (a) and service of process meets the standards set forth by 28 U.S.C. § 1608.").

Plaintiffs submit sworn declarations supporting their right to entry of judgment as to each plaintiff herewith.  This Court has held that sworn declarations such as those submitted by plaintiffs herewith are sufficient to satisfy the requirement of the FSIA, 28 U.S.C. Section 1608(e), that a claimant must "establish[] his claim or right to relief by evidence satisfactory to the court." E.g., *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016), citing *Reed  v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012) and *Weinstein v. Islamic Republic of Iran* 184 F. Supp. 2d 13 at 19 (D.D.C. 2002).  This Court has endorsed that view as well.  *Braun v. Islamic Republic of Iran*, 228 F. Supp.3d 64, 74-75 (D.D.C. 2017)(BAH).  See also *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018)(BAH); *Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888 (D.D.C. 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273 (D.D.C. 2020)(Howell, C.J.).  The United States Court of Appeals for the DC Circuit has held that section 1608(e) "does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens v. Republic*

*of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), rev'd on other grounds sub nom. *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

**II.     THE COURT MAY TAKE JUDICIAL NOTICE OF EVIDENCE ESTABLISHING THE SAME DEFENDANT'S LIABILITY FOR THE JUNE 25, 1996 TERRORIST ATTACK ON THE KHOBAR TOWERS.**

This action arises out of the terrorist attack on June 25, 1996, on the Khobar Towers apartment complex in Dhahran, Saudi Arabia. All four moving plaintiffs' claims arise from that same single terrorist bombing attack.

This Court has already found defendant liable for the same terrorist attack in several prior decisions: *Blais et al. v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006); *Estate of Heiser et al. v. Islamic Republic of Iran,* 466 F. Supp. 2d 229 (D.D.C. 2006); *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.2d 163 (D.D.C. 2010); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10 (D.D.C. 2018) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888 (D.D.C. 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 22084, 2020 WL 619925 (D.D.C. 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, 2020 U.S. Dist. Ct. LEXIS 116378, 2020 WL 3606273 (D.D.C. 2020)(Howell, C.J.).

In *Blais* and *Estate of Heiser*, the Court heard extensive evidence, including expert testimony, and held that Iran was liable for the same June 25, 1996, terrorist attack on the Khobar Towers at issue in this case. In the *Rimkus* case, the court took judicial notice of the findings in *Blais* and *Heiser* to impose liability for the same attack on Iran as well. Defendant defaulted and did not appear in the *Blais*, *Heiser, Rimkus, Akins, Aceto Schooley* and *Christie*

cases, just as it has defaulted and refused to appear in this case.  Plaintiffs here are similarly situated in all respects to plaintiffs in those cases.

Fed. R. Evid. 201 authorizes the Court to take judicial notice of facts previously determined by the court in circumstances such as those presented here.  "It is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties." *Veg-Mix Inc. v. U.S. Dept. of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987).  The court has held in the *Heiser* case itself that "a court may take judicial notice of related proceedings and records in cases before the same court." *Heiser*, supra, 466 F. Supp. 2d at 262-63, quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp.2d 105, 109 n.6 (D.D.C. 2005).

The Court has recognized the appropriateness of taking such judicial notice and entering default judgments as to liability in subsequent cases involving the same terrorist incidents previously adjudicated against the same defendants in default.  E.g., *Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 103 (D.D.C. 2007); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50-51 (D.D.C. 2009)("this Court may take judicial notice of related proceedings and records in cases before the same court. ") *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010)("the Court may review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence"); see also *Murphy v. Islamic Republic of Iran,* No. 06-cv-596 (D.D.C. Oct. 2, 2007); *Estate of Anthony K. Brown v. Islamic Republic of Iran*, No. 08-cv-531 (D.D.C. Feb. 1, 2010).

In *Rimkus,* the Court concluded that judicial notice of findings in the *Heiser* and *Blais* cases would be appropriate because "the history of litigation stemming from the bombing of Khobar Towers … is extensive."  750 F. Supp.2d at 167.  The *Rimkus* court continued:

6

> Over years of litigation, the plaintiffs in both *Blais* and *Heiser* presented substantial evidence to the Court concerning the Khobar Towers bombing. In *Blais,* the plaintiffs submitted evidence concerning the investigations and opinions of Louis Freeh and Dale Watson. Mr. Freeh was the FBI Director at the time of the bombing, and under his direction the FBI "conducted a massive and thorough investigation of the attack, using over 250 agents." *Blais,* 459 F. Supp. 2d at 48. Mr. Watson was the Deputy Counterterrorism Chief of the FBI in 1996, and subsequent to the attack he became the Section Chief for all international terrorism at the Bureau. He was responsible "for day to day oversight of the FBI investigation" and has given sworn testimony concerning the results of the investigation. *Id.*

750 F. Supp.2d at 168. The *Rimkus* opinion further detailed the evidence it judicially noticed from *Blais* and *Heiser* for holding defendants liable for the Khobar Towers terrorist attack:

> In addition, Dr. Bruce Tefft, "one of the founding members of the CIA's counterterrorism bureau" and expert consultant on terrorism-related issues, was qualified as an expert and gave extensive testimony concerning the defendants' involvement in terrorist activities. *Id.* at 48-49. In *Heiser,* the evidence was even more extensive than in *Blais,* and was presented to a magistrate judge over the course of more than two weeks. *Heiser I,* 466 F. Supp. 2d at 250.
>
> ….
>
> Based on all of the above evidence, as well as additional documentary and testimonial submissions, the Court in both *Blais* and *Heiser* concluded that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran; the IRGC had the responsibility of working with Saudi Hizbollah to execute the plan… *Id.* at 265; *Blais,* 459 F. Supp. 2d at 48 (quoting with approval Dr. Tefft's conclusion that defendants "were responsible for planning and supporting the attack on the Khobar Towers").

750 F. Supp.2d at 168 (footnote omitted).

Accordingly, plaintiffs' motion asking the Court to take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran for providing material support and resources to the terrorists who

attacked the Khobar Towers complex on June 25, 1996, is well-supported and amply-precedented. There is no reason not to follow those precedents here.

### III. ALL PLAINTIFFS HAVE SUFFERED PHYSICAL AND PSYCHOLOGICAL INJURIES COVERED BY SECTION 1605A.

The state-sponsored terrorism exception provides a private right of action. The action is available to, among others, nationals of the United States and the legal representatives of such persons. 28 U.S.C. § 1605A(c). Foreign states that meet subsection (a)(2)(A)(i)'s requirements as "state sponsors of terrorism" may be held liable under subsection (c) "for personal injury or death" caused by the foreign state or its agents. Id. "In any such action damages may include economic damages, solatium, pain and suffering, and punitive damages." Id.

It is well established that Iran is now, and has continuously been since 1984, a state sponsor of terrorism. Iran was designated by Secretary of State George P. Shultz on January 23, 1984, in accordance with the Export Administration Act of 1979, as a "country which has repeatedly provided support for acts of international terrorism." 49 Fed. Reg. 2836–02 (Jan. 23, 1984) (statement of Secretary of State George P. Shultz). This designation meets section 1605A's definition of "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Iran continues to be designated as a state sponsor of terrorism to this day. *State Sponsors of Terrorism,* U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited December 1, 2020).

Although Section 1605A(c) provides a private right of action, it does not itself specify the substantive law to be applied. This Court has therefore applied "general principles of tort law," looking to authoritative sources such as the Restatement (Second) of Torts. See, e.g., *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 24 (D.D.C. 2009); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335

(D.D.C. 2014).  These cases have repeatedly and correctly held that, under any possible interpretation of these general principles, a state sponsor of terrorism which is shown to have provided material resources and support to a terrorist organization for an attack that causes an "extra-judicial killing" and/or "personal injury" is responsible for intentional infliction of emotional distress and the pain and suffering of the immediate family of the deceased as well as loss of consortium and solatium. [3]

In *Akins v. Islamic Republic of Iran*, supra, this Court held that Iran was liable to the service members who were present at the Khobar Towers attack for the torts of assault, battery, and intentional infliction of distress. 332 F. Supp. 2d at 37.  The Court also held Iran liable to the close family members of those present for intentional infliction of emotional distress, with rights to solatium damages expressly mentioned in Section 1605A(c).  Id. at 38.

In *Maalouf v. Islamic Republic of Iran*, 923 F. 3d 1095, 1113 (D.C.Cir. 2019), the DC Circuit squarely held that a defendant that does not appear (as here) cannot benefit from a statute-of-limitations defense: A district court may not "act *sua sponte* to raise affirmative defenses on behalf of defendants who do not appear to defend actions against them."

**IV.  PLAINTIFFS ARE ENTITLED TO COMPENSATORY DAMAGES.**

Attached as an Addendum hereto are sworn Declarations from the four moving plaintiffs. Plaintiff Edith Blank, the mother of Charles Blank, describes how proud she was of her son and his accomplishments, but also the pain of learning while at work of the attack on the Khobar Towers residential complex.   She describes the fear that gripped her before she eventually learned that her son survived, and the desperately bad feeling that she may have lost her son just

---

[3] "Under the FSIA, a solatium claim is indistinguishable from" a claim for intentional infliction of emotional distress. *Valore v. Islamic Republic of Iran*, 700 F. Supp 2d at 85.

9

four months after she had lost her husband. Exhibit A hereto, Edith Blank Declaration, paragraphs 6-7.

Christine Cramblett, Charles Blank's sister, describes how she and Charles had grown up in a close-knit family, and that they often had to rely on each other for companionship and play as kids because they lived in far-off lands. She remembers looking out for Chuck, and making sure that a neighborhood bully who had threatened him backed off. She describes the emotional distress that hearing about the attack caused her, as well as observing its initial effects on Chuck when she next saw him. Exhibit B hereto, Cramblett Declaration Paragraph 14.

Charles Blank was awarded $5 million in compensatory damages in the *Akins* case. The measure of damages for Charles Blank's relatives here should be the full measure awarded to other parents and siblings of those service members who received a full measure of damages, which has generally been $2.5 million for a parent and $1.5 million for a sibling. See *Aceto*, *Akins*, *Schooley*, and *Christie*, supra. Accordingly. Plaintiff Edith Blank should be awarded $2.5 million in compensatory damages, and Plaintiff Christine Cramblett should be awarded $1.5 million in compensatory damages.

Judith MacKenzie, Nick MacKenzie's mother, submits testimony about her terrible homecoming on June 25, 1996, when she saw her husband shaking with emotion when he tried to tell her about what may have happened to their son. "We held each other and wept uncontrollably." Exhibit C hereto, Judith Mackenzie Declaration, paragraph 7. "We were devastated and sick with grief and worry," id, paragraph 8, until they finally heard from Nick and knew that he would be alright. She describes that the next few months were also difficult because they were anxious about Nick's continued presence in Saudi Arabia, and worried that another attack might follow. Id., paragraph 12.

David MacKenzie, Nick's brother, describes being very close with his brother, and enjoying a number of different activities with him when they were growing up, especially skateboarding. He remained close to Nick even after Nick left for the Air Force. He states that he first heard about the attack on the Khobar Towers in a phone call from his parents, who "sounded extremely anxious and worried." Exhibit D hereto, David MacKenzie Declaration, paragraph 9. He felt terrible because they did not know if Nick had been killed or badly injured, and worried that "I may never see Nick again." Id. When Nick finally returned home, David felt that he was not the same person he had been when he left. "I felt that I had lost someone close to me who had been replaced with a colder, more suspicious and anxious person." Paragraph 13.

Nick MacKenzie was awarded $2.5 million in compensatory damages in *Akins*. Mr. MacKenzie, along with a large number of other plaintiffs in the *Akins* case, plan to submit a motion asking the Court to revise his award upward to $5 million in accordance with the Court's more recent practice and precedent.[4] However, whether that other motion of certain *Akins* plaintiffs is granted or not, the damages awarded to Plaintiffs Judith and David Mackenzie

---

[4] In *Schooley*, this Court relied in large part on an "objective metric" — the VA disability rating — to "determin[e] the relative degree of injury suffered by each service-member plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id*. (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id*..

"Thus, service member plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40-60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and service-member plaintiffs rated 70-100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *Schooley*, 2019 WL 2717888, at *75. This Court followed that approach in *Christie*, as well. Under this approach, Nicholas MacKenzie would have been awarded $5 million in compensatory damages based on his VA disability rating.

11

should not be below the "standard" of compensation adopted by the Court in the recent *Aceto*, *Christie*, and *Schooley* decisions, which would be the full $2.5 million for a parent and $1.5 million for a sibling of a servicemember with Nicholas MacKenzie's level of disability.  If this is the proper and appropriate standard of compensation applicable in post-*Akins* cases, there is no reason that these plaintiffs here should be artificially limited or bound by a superseded standard that was applied in *Akins*.  Accordingly, plaintiff Judith Mackenzie should be awarded $2.5 million in compensatory damages, and Plaintiff David Mackenzie should be awarded $1.5 million in compensatory damages.

## V. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES.

In *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1610 (2020), the Supreme Court decided that punitive damages may be awarded "retroactively" in circumstances such as those present here.  Following *Opati*, this Court has awarded such punitive damages.  E.g. *Christie v. Islamic Republic of Iran, supra*, 2020 U.S. Dist. LEXIS 116378 at *93.  There, the Court awarded punitive damages equal to compensatory damages apportioned among the plaintiffs in an amount proportional to their compensatory damages.  Plaintiffs before the Court here should be awarded the same measure of punitive damages as well.

## VI. PLAINTIFFS ARE ENTITLED TO PREJUDGMENT INTEREST.

In *Christie*, this Court awarded prejudgment interest from the date of the terrorist attack—June 25, 1996—to the date of the judgment rendered.  There, this Court reasoned as follows: "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations [citing *Oveissi II*, 879 F. Supp. 2d at 56].[5]  In cases like this

---

[5] *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012).

one, the general practice has been to award prejudgment interest." *Christie, supra*, at **62-63, emphasis added.  The Court should do the same here.

## CONCLUSION

For all the reasons stated, the Court should take judicial notice of findings of fact and conclusions of law in related similar cases, and should enter a final judgment against Defendant Iran and in favor of each plaintiff in the amounts set out above, awarding compensatory damages, punitive damages, and prejudgment interest.

        Respectfully submitted,

/s/   Paul G Gaston
Paul G. Gaston, DC Bar #290833
LAW OFFICES PAUL G. GASTON
1901 Pennsylvania Avenue, NW, Suite 607
Washington DC 20006
202-296-5856
paul@gastonlawoffice.com

*Attorney for Plaintiffs*