# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EDITH BLANK, *et al.*,

        Plaintiffs,

        v.

ISLAMIC REPUBLIC OF IRAN,

        Defendant.

Civil Action No. 19-3645 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

On June 25, 1996, a devastating terrorist attack on the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel and contractors, resulted in the deaths of nineteen service-members and severe injuries to scores of others, including three individual Air Force service members, whose five immediate family members are plaintiffs in this action. Compl. at 1–2, ECF No. 1. Plaintiffs allege that defendant, the Islamic Republic of Iran, is liable under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, for "provid[ing] material support and resources to Hezbollah," *id.* at 4, "which caused, enabled and facilitated the terrorist attack at the Khobar towers," *id.* at 8. Plaintiffs have complied with the FSIA's requirements for service on defendant, which has failed to enter an appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Serv., ECF No. 15; Clerk's Entry of Default, ECF No. 17. Four of the five plaintiffs now seek the entry of a default judgment against defendant as to liability and damages. Four Pls.' Mot. to Take Judicial Notice of Evid. in Prior Related Cases

and for Entry of Default J. as to Liab. and Damages ("Pls.' Mot."), ECF No. 18.[1]  For the reasons

detailed below, default judgment as to liability and damages is granted.

## I.    BACKGROUND

Several prior decisions of this Court have found defendant, among others, liable for the

Khobar Towers bombing.  *See Christie v. Islamic Republic of Iran*, No. 19-1289 (BAH), 2020

U.S. Dist. LEXIS 116378, at *2–4, *55–57 (D.D.C. July 2, 2020) (Howell, C.J.); *Aceto v.

Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 U.S. Dist. LEXIS 22084 at *2–5, *46–49

(D.D.C. Feb. 7, 2020) (Howell, C.J.); *Schooley v. Islamic Republic of Iran*, No. 17-1376 (BAH),

2019 U.S. Dist. LEXIS 108011 at *6–8, *291–294 (D.D.C. June 27, 2019) (Howell, C.J.); *Akins

v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 10–11, 35–37 (D.D.C. 2018) (Howell, C.J.);

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 169–70, 181–82 (D.D.C. 2010)

(Lamberth, J.); *Estate of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229,

263–65 (D.D.C. 2006) (Lamberth, J.); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 54–

55 (D.D.C. 2006) (Lamberth, J.).  In *Blais* and *Heiser I*, the Court heard evidence and witness

testimony.  *See Blais*, 459 F. Supp. 2d at 46–52; *Heiser I*, 466 F. Supp. 2d at 250.  In *Heiser I*

alone, the evidentiary hearing took seventeen days and included examination of witnesses,

including seven expert witnesses.  *See id.*[2]  *Rimkus*, *Akins*, *Schooley*, *Aceto*, and *Christie* each

---

[1]    Plaintiffs' counsel was unable, after much effort over a period of six months, to contact the remaining
plaintiff Jim Gaydos, for a declaration and so moves here on behalf of only four plaintiffs.  *See* Pls.' Mem. Supp.
Mot. to Take Judicial Notice of Evid. in Related Prior Cases and for Entry of Default J. as to Liab. and Req. to
Submit Documentary Evid. Under Seal ("Pls.' Mem.") at 1 n.1, ECF No. 18-1.  Following issuance of an order to
show cause directing plaintiff Gaydos to report to the court why his claims should not be dismissed for failure to
prosecute pursuant to Local Civil Rule 83.23, Min. Order (Apr. 28, 2021), plaintiffs' counsel submitted a response
informing the Court that he was still unable to reach plaintiff Gaydos, Resp. to Show Cause Order, ECF No. 20.
Accordingly, plaintiffs' counsel moved to withdraw from further representation of plaintiff Gaydos, which motion
the Court granted after directing plaintiff Gaydos to notify plaintiffs' counsel whether he intends to proceed *pro se*
or object to the withdrawal and receiving no response.  Mot. to Withdraw, ECF No. 19; Min Order (May 5, 2021).
No communication to the Court from plaintiff Gaydos has been received and, consequently, his claims were
dismissed, without prejudice, for failure to prosecute.  Min. Order (June 10, 2021) (citing D.D.C. LCvR 83.23).
[2]    The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former Director of the Federal Bureau of
Investigation ("FBI"), *Heiser I*, 466 F. Supp. 2d at 252–53, 260–62; (2) Dr. Patrick Clawson, a scholar of Middle

concluded that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus*, 750 F. Supp. 2d at 172–73; *Akins*, 332 F. Supp. 3d at 10–11; *Schooley*, 2019 U.S. Dist. LEXIS 108011, at *5–8; *Aceto*, 2020 U.S. Dist. LEXIS 22084, at *2–5; *Christie*, 2020 U.S. Dist. LEXIS 116378, at *2–5, and the plaintiffs here request that this Court "take judicial notice of prior findings of fact and supporting evidence imposing liability under Section 1605A (and its predecessor, Section 1605(a)(7)) on Iran for providing material support and resources to" those responsible for the Khobar Towers attack, Pls.' Mem. at 7–8.

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).[3] Rule 201 is used frequently to judicially notice factual evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). This avoids "the formality of having that evidence reproduced." *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)); *see also*

---

Eastern politics who has frequently provided expert testimony regarding Iran's involvement in sponsoring terrorism, *id.* at 253–54, 262; (3) Dr. Bruce Tefft, a founding member of the Central Intelligence Agency ("CIA") Counterterrorism Bureau and regular consultant on issues of terrorism, *id.* at 253–54, 263–64; (4) Dale Watson, the former Deputy Counterterrorism Chief of the FBI, *id.* at 253, 262; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on grief process, *see id.* at 269–70, 275, 280, 283, 285–86, 288–91, 293, 295, 297–303, 308, 310–12, 314, 316–18, 322–27, 330, 332, 335–36, 339–45, 347–51, 353–55; and (7) Dr. Herman Miller, an economic consultant, *id.* at 273–74, 282, 288, 290, 292, 300, 307, 313–14, 320–21, 330, 334, 338.

[3] "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women, Wash., D.C. Chapter v. Social Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, advisory committee's notes). The Rule does not govern judicial notice of "legislative facts," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d 727 at 737 n.95 (quoting FED. R. EVID. 201, advisory committee's notes).

*Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (quoting *Rimkus*, 750 F. Supp. 2d at 172)); *Estate of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (taking "judicial notice of the evidence presented in the earlier cases").

Taking judicial notice of prior findings "does not conclusively establish the facts found in those cases" in the later FSIA case. *Foley*, 249 F. Supp. 3d at 191. Rather, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010); *see also Rimkus*, 750 F. Supp. 2d at 172. In fact, "courts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Id.* (citing *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010)). Notably, the D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. In *Han Kim v. Democratic People's Republic of Korea*, the D.C. Circuit held that the plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice. 774 F.3d 1044, 1049 (D.C. Cir. 2014).

This Court is persuaded that this approach is both "efficient and sufficiently protective of the absent defendant['s] interests," *Akins*, 332 F. Supp. 3d at 11, and will therefore adopt it and grant the plaintiffs' request to take judicial notice of the evidence presented in *Heiser I*, *Blais*,

4

*Rimkus*, *Akins*, and *Schooley*, *see id.* (stating that factual evidence developed in other cases "involving the same conduct by the same defendants is admissible and may be relied upon in this case"); Pls.' Mot. at 2. The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

### A.     The Attack on Khobar Towers

The Khobar Towers residential complex in Dhahran, Saudi Arabia "housed the coalition forces," including the U.S. military forces, "charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. About ten minutes before 10:00 pm on June 25, 1996, "a large gasoline tanker truck pulled up" and parked "alongside the perimeter wall of the Khobar Towers complex." *Id.*; *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 16. Security guards near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," but the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252; *see also* Compl. ¶ 16. The blast "sheared off the face of Building 131," *Heiser I*, 466 F. Supp. 2d at 252, and "caused structural damage in buildings a quarter mile away," Compl. ¶ 16. "The explosion killed dozens of persons including nineteen American servicemen, [and h]undreds of others were injured and burned." *Id.* Subsequent "investigation determined that the force of the explosion was the equivalent of 20,000 pounds of TNT. The Defense Department said that it was the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

### B.     Defendant Iran's Role

Iran "has been designated a state sponsor of terrorism" by the U.S. Department of State "since January 19, 1984." *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz v. Islamic Republic of Iran* ("*Fritz I*"), 320 F. Supp. 3d 48, 77 (D.D.C. 2018); BUREAU OF COUNTERTERRORISM, U.S. DEP'T OF STATE, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-

terrorism/.  Prior proceedings have found that Iran planned and supported the Khobar Towers

bombing.[4]  Both the Ayatollah Ali Khamenei, the Supreme Leader of Iran at the time, and the

Minister of Intelligence and Security "approved" the attack.  *Heiser I*, 466 F. Supp. 2d at 252.

The truck bomb used was "assembled" at a base in Lebanon's Bekaa Valley "jointly operated by

the [Iranian Revolutionary Guard Corps ("IRGC")] and by the terrorist organization known as

Hezbollah;" the individuals who carried out the bombing called themselves "Saudi Hezbollah."

*Id.*

     These conclusions are based in part on the testimony of four key expert witnesses in *Blais*

and *Heiser I*.  Louis Freeh, who was director of the FBI at the time of the bombing, and Dale

Watson, then deputy counterterrorism chief of the FBI, testified in *Heiser I* based on their

oversight of the FBI's "massive and thorough investigation of the attack, using over 250 agents."

*Id.*; *see also id.* at 260–62.  "Based on that investigation, an Alexandria, Virginia, grand jury

returned an indictment . . . against 13 identified members of the pro-Iran Saudi Hezbollah

organization."  *Id.* at 252.  During its investigation, the FBI interviewed six members of Saudi

Hezbollah who "admitted to the FBI their complicity in the attack on Khobar Towers, and

admitted that senior officials in the Iranian government provided them with funding, planning,

training, sponsorship, and travel necessary to carry out the attack on Khobar Towers."  *Id.* at 253.

Both Director Freeh and Deputy Watson testified to their conclusions.  *Id.* at 264.  Based on

information gathered in their investigations, both testified that "Iran, [the Ministry of Information

and Security ("MOIS")], and IRGC were responsible for the Khobar Towers bombing carried out

by Saudi Hezbollah."  *Id.* at 264.

---

[4]     Under the FSIA, Iran is "vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C.
§ 1605A(c)(4).

Finally, Dr. Patrick Clawson provided expert testimony in support of this conclusion in *Heiser I*: "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and that Saudi Hezbollah carried out the attack under their direction." *Id.* at 253. This conclusion was "based on his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials, as well as his academic research on the subject." *Id.* Dr. Bruce Tefft, a former member of the CIA's Counterterrorism Bureau, supported Dr. Clawson's "expert opinion," based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA" that "the Islamic Republic of Iran and the Iranian Revolutionary Guards Corp were responsible for planning and supporting the attack on Khobar Towers." *Id.* at 253–54.

## C. The Instant Plaintiffs

The moving plaintiffs are four immediate family members of two individual Air Force servicemen who were severely injured in the Khobar Towers bombing. *See* Compl. at 2, ¶¶ 3–4, 6–7. The plaintiffs are described below.

### 1. *Two Family Members of Charles Blank*

Air Force service member Charles Blank was injured in the Khobar Towers bombing and was awarded $5,000,000 in pain and suffering damages as a plaintiff in *Akins*, 332 F. Supp. 3d at 47. After the blast, Blank had to be "helped out from under the frame of the glass door," "ultimately required 22 stitches in his leg," and, for nearly ten years, had to "pick[] and pull[] pieces of glass out of his legs as they gradually worked their way to the skin surface," *id.* at 15–16 (quoting Pls.' Damages Mot., Attach. 2, Decl. of Charles Blank ("Charles Blank Decl.") (Jun. 28, 2018) ¶¶ 4, 9, 14, *Akins v. Islamic Republic of Iran*, Civil Action No. 17-675 (BAH), ECF No. 25-2 at 23). As of 2018, Blank still experienced "flashbacks to the . . .

bombing," which are triggered by "new of terrorist attacks" or movie scenes including "explosions and flying glass." *Id.* at 16 (quoting Charles Blank Decl. ¶¶ 15–18).

Two members of Blank's family are plaintiffs in this lawsuit: his mother, Edith Blank, and his sister, Christine Cramblett. On June 25, 1996, Blank's mother, Edith Blank, was finishing up her shift as a cashier at the military exchange where she worked when, suddenly, "everyone around [her] was buzzing with some news" that there had been a terrorist attack at the Khobar Towers. Pls.' Mem., Ex. A, Decl. of Pl. Edith Blank ("Edith Blank Decl.") (Oct. 10, 2020) at 2, ECF No. 18-2. "[Her] blood ran cold" at the thought of possibly having lost her son so soon after losing her husband just four months earlier. *Id.* She "became even more anxious and worried" upon returning home and seeing the images of the bombing on the news, "terrified" that her son was "buried somewhere in the rubble." *Id.* at 3. While Edith Blank eventually heard from her son, he remained in Saudi Arabia for several more months, leaving her and her family anxious and concerned about the possibility of another attack. *Id.* When her son finally returned home, Edith Blank noticed that he "seemed less confident and even a little nervous at times," apparently "[shaken] up" by the attack and "by the loss of his fellow airmen." *Id.* Edith Blank "suffered great emotional distress" from learning of the attack and from seeing its effects on her son. *Id.*

Blank's older sister, Christine Cramblett, was working in Japan when she learned of the Khobar Towers attack. Pls.' Mem., Ex. B, Decl. of Pl. Christine Cramblett ("Cramblett Decl.") (Oct. 10, 2020) ¶ 9, ECF No. 18-2. Edith Blank called Cramblett "deeply distraught and crying," leading Cramblett to feel "waves of anxiety and concern" wash over her. *Id.* Although overjoyed when she learned a few days later that her brother would survive, *id.* ¶ 10, when Cramblett saw her brother in person a few month later, she observed that he "did not seem as

confident and outgoing" as before and that he was "more detached," *id.* ¶ 11. Cramblett "suffered substantial emotional distress when [she] heard of the attack," especially before learning that Blank had survived, and then later when she saw how the blast had affected Blank. *Id.* ¶ 13.

### 2. *Two Family Members of Nicholas L. MacKenzie*

Air Force service member Nicholas L. MacKenzie was also injured, and suffered lasting psychological injury, in the Khobar Towers bombing, for which he was awarded $2,500,000 as a plaintiff in *Akins*, 332 F. Supp. 3d at 47. MacKenzie was asleep when the bomb detonated, but "was woken up by a flash of light" before the explosion "sent his bed, with him in it, crashing against the wall of his room." *Id.* at 14–15 (quoting Pls.' Damages Mot., Attach. 2, Decl. of Nicholas L. MacKenzie ("MacKenzie Decl.") (June 25, 2018) ¶ 4, *Akins v. Islamic Republic of Iran*, Civil Action No. 17-675 (BAH), ECF No. 25-2)). MacKenzie received treatment at a triage area and was later told "he would be eligible for a Purple Heart," which award he declined because "he knew there were many more seriously wounded airmen." *Id*. at 15 (quoting MacKenzie Decl. ¶ 6). After the attack, MacKenzie remained at Khobar Towers for two and a half months before leaving the Air Force in 1997, "bouncing around in several jobs, none lasting very long." *Id.* (quoting MacKenzie Decl. ¶¶ 7–8). MacKenzie exhibits "many PTSD symptoms," including "startling easily" and "anger management issues," but declined to seek diagnosis or receive treatment for PTSD for "personal reasons." *Id.* (quoting MacKenzie Decl. ¶ 9).

Two members of Nicholas L. MacKenzie's family are plaintiffs in this lawsuit: his mother, Judith MacKenzie, and his brother, David MacKenzie. MacKenzie's mother, Judith MacKenzie, arrived home from work to find her husband, Larry, "deeply engrossed in a phone conversation" with their son's service records and personal matters laid out in front of him. Pls.'

Mem., Ex. C, Decl. of Pl. Judith MacKenzie ("Judith MacKenzie Decl.") (Oct. 30, 2020) ¶ 6, ECF No. 18-2.  Judith MacKenzie's husband informed her that her son's living quarters at the Khobar Towers had been attacked and that "there was no word yet about what may have happened" to her son.  *Id.* ¶ 7.  The two then "wept uncontrollably" and were "devastated and sick with grief and worry," *id.* ¶¶ 7–8, until a day or two later when they finally heard that their son was alive, *id.* ¶ 10.  In the following few months until her son returned to the United States, MacKenzie and her family "were always on edge," dreading the possibility of a new attack.  *Id.* ¶ 11.  During that time, she was unable to sleep at night, and took sleep medication for the first time in her life.  *Id.* ¶ 12.  When MacKenzie's son finally came home, he "did not seem like himself," and he was "bewildered, anxious, and insecure."  *Id.* ¶ 15.  His struggles with "extreme sadness, withdrawal from social activities, and lack of interest in some of his former favorite pastimes," were obvious to MacKenzie and "hurt [her] heart."  *Id.* ¶ 16.  While her son has improved over time, finding a good job and stability in his family life, he remains "easily startled and tries to avoid stressful situations which, at times, leads to anxiety and anger."  *Id.* ¶ 17.

MacKenzie's older brother, David MacKenzie, learned about the Khobar Tower bombings on June 25, 1996, when he received an anxious and worried call from his parents. Pls.' Mem., Ex. D, Decl. of Pl. David MacKenzie ("David MacKenzie Decl.") (Sept. 29, 2020) ¶ 9, ECF No. 18-2.  David MacKenzie's parents explained that they had not yet heard anything about his brother.  *Id.*  Worried that he might never see his brother again, David MacKenzie felt terrible.  *Id.*  A few days later, David MacKenzie was relieved and happy to learn that his brother had been injured but was alive.  *Id.* ¶¶ 10–11.  Like his mother, David MacKenzie spent the next few months while his brother was still at the Khobar Towers "worried that there could be another attack at any time."  *Id*. ¶ 12.  When David MacKenzie's brother finally returned home, "he was

not the same person [David MacKenzie] had known when [his brother] left." *Id.* ¶ 13. His

brother was "less trusting and quick to anger about small things," *id.* ¶ 13; David MacKenzie felt

that he had "lost someone close to [him] who had been replaced with a colder, more suspicious

and anxious person," *id.*

### D. Procedural History

The plaintiffs filed this lawsuit on December 6, 2019. *See* Compl. As discussed, *infra* in

Part III.B, defendant was properly served under the FSIA. When defendant did not appear, the

Clerk entered default against the defendant on December 1, 2020. *See* Clerk's Entry of Default.

Four plaintiffs then moved for judicial notice of evidence in prior related cases and for entry of

default judgment as to liability and damages. *See generally* Pls.' Mot.; *see also* Pls.' Mem. This

motion for default judgment is now ripe for review.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 55(b)(2) permits a court to consider entering a default

judgment when a party applies for that relief. *See* Fed. R. Civ. P. 55(b)(2). Nevertheless,

"strong policies favor resolution of disputes on their merits" and, therefore, "[t]he default

judgment must normally be viewed as available only when the adversary process has been halted

because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir.

1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691

(D.C. Cir. 1970)). Furthermore, "entry of a default judgment is not automatic," *Mwani v. bin

Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and so the procedural posture of a

default does not relieve a federal court of its typical obligations, including its "affirmative

obligation" to determine whether it has subject-matter jurisdiction over the action, *James

Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court

should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.

When default judgment is sought under the FSIA, a claimant must also "establish[] his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). This requirement "provides foreign sovereigns a special protection akin to that assured the federal government by FED. R. CIV. P. 55([d])." *Jerez v. Republic of Cuba*, 775 F.3d 419, 423 (D.C. Cir. 2014); *see also* H.R. REP. No. 94-1487, at 26 (1976) (stating that § 1608(e) establishes "the same requirement applicable to default judgments against the U.S. Government under rule 55([d])"). While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," *Han Kim*, 774 F.3d at 1047 (citing 28 U.S.C. § 1608(e)), courts must be mindful that Congress enacted § 1605A, FSIA's terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins," *id.* at 1048; *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). With this objective in mind, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Courts take uncontroverted factual allegations that are supported by admissible evidence as true. *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing

*Rimkus*, 750 F. Supp. 2d at 171)); *accord* Fed. R. Civ. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when an adverse party "fails to properly address another party's assertion of fact").

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient.'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)). Thus, "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory." *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted." *Owens*, 864 F.3d at 785 (second alteration in original) (internal quotation marks and citations omitted).

## III. DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendants, (3) the plaintiffs have presented satisfactory evidence to establish their claims against the defendants, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. These requirements are addressed *seriatim*.

### A.      Subject-Matter Jurisdiction under the FSIA

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title." 28 U.S.C. § 1330(a). The plaintiffs

seek *in personam* relief. This Court must decide, therefore, whether defendant is entitled to immunity under the "state sponsor of terrorism" exception provided in §1605A.[5]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13–14 (citing 28 U.S.C. §§ 1605–1607). The plaintiffs assert jurisdiction based on the FSIA's terrorism exception 28 U.S.C. § 1605A, *see* Compl. ¶ 1, which abrogates a foreign state's immunity in cases where a plaintiff seeks "money damages" for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" if "engaged in by an official, employee, or agent of such foreign state," 28 U.S.C. § 1605A(a)(1). The term "extrajudicial killing" is defined as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)); *see also* 28 U.S.C. § 1605A(h)(7) (stating that the term "extrajudicial killing" in the FSIA's terrorism exception has the "meaning given" in the statute just quoted, "the Torture Victim Protection Act of 1991"). The exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and that, at the time, "the 'claimant or the victim was' a 'national

---

[5]     This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and the defendants have "forfeited [their] affirmative defense . . . by failing to raise it in" this Court, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1115 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[6]

Plaintiffs satisfy each of the applicable elements here. As noted, Iran was designated a state sponsor of terrorism in 1984, twelve years before the 1996 Khobar Towers bombing. *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz I*, 320 F. Supp. 3d at 77; BUREAU OF COUNTERTERRORISM, *supra*. The four plaintiffs have averred in sworn declarations that they were United States citizens at the time of the attack.[7]

Finally, the plaintiffs seek damages "for personal injury . . . that was caused by an . . . extrajudicial killing" for which the defendants provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by non-state actors."). The truck bombing caused the deaths of nineteen American military personnel, which were manifestly "extrajudicial killings," as well as the injuries to plaintiffs' family members present at the scene of the terrorist attack. *See, e.g.*, *Rimkus*, 750 F. Supp. 2d at 182 ("The actions of defendants constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins*, 332 F. Supp. 3d at 33 (same); *Aceto*, 2020 U.S. Dist. LEXIS 22084 at *42–43 (same); *Christie*, 2020 U.S. Dist. LEXIS 116378, at *51 (same).

In addition, this Court takes judicial notice of the evidence presented in *Blais* and *Heiser I*, which demonstrates that defendant provided "material support or resources" for this

---

[6]    Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim," 28 U.S.C. § 1605A(a)(2)(A)(iii), but the attack took place in Saudi Arabia, not Iran, so this requirement does not apply.

[7]    *See* Edith Blank Decl. at 1 (attesting to declarant's United States citizenship); Cramblett Decl. ¶ 2 (same); Judith MacKenzie Decl. ¶ 2 (same); David MacKenzie Decl. ¶ 2 (same).

extrajudicial killing. The evidence in those cases, described *supra* Parts I.A and I.B, establishes that defendants authorized, "organized and sponsored" the Khobar Towers attack. *Heiser I*, 466 F. Supp. 2d at 262. Further, the evidence shows that defendants helped to recruit, train, fund, supply, and direct Saudi Hezbollah. *See id.* at 262–63; *see also Blais*, 459 F. Supp. 2d at 48–49. This establishes that defendant's actions were "a 'substantial factor' in the sequence of events that led to the plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence of' the defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's "terrorism exception" is proximate cause).

Accordingly, under 28 U.S.C. § 1605A, defendants are not immune from this suit, and subject-matter jurisdiction may be properly exercised. *See* 28 U.S.C. § 1330(a).

### B. Personal Jurisdiction under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b). Here, service was ultimately made under § 1608(a)(4).

Section 1608 first prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)–(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61–62 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), as "[t]he defendants have neither made a special arrangement for service with the plaintiffs, nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

Thus, the plaintiffs initially attempted service under paragraph (a)(3) of § 1608 by requesting the clerk to send a copy of the summons, complaint, and notice of suit, along with a

Farsi translation, via the United States Postal Service's Registered Return Receipt First Class International Mailing Services, to defendant, through the Iranian Ministry of Foreign Affairs. *See* Certificate of Mailing, ECF No. 10. After the USPS deliveries were refused by the recipients, *see* Summons Returned Unexecuted, ECF No. 11, plaintiffs, following § 1608(a)(4), transmitted two copies of the summons, complaint, and notice of suit, along with Farsi translations, as well as one copy of the Foreign Sovereign Immunities Act, "through diplomatic channels," *see* 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)"); *see* Certificate of Mailing, ECF No. 14. Specifically, on August 20, 2020, the United States Department of State stated in a letter that it had met the requirements for diplomatic service under § 1608(a)(4) by causing delivery of the summons, complaint, and notice of suit to Iran through Swiss channels on July 14, 2020. *See* Return of Serv. at 1, ECF No. 15. By this method, Iran was served. *Id.* Consequently, this Court has personal jurisdiction over defendants.

### C.    Defendants' Liability

The plaintiffs, as family members of military personnel, who were injured at the Khobar Towers bombing and awarded damages in *Akins,* bring claims for intentional infliction of emotional distress ("IIED"), Compl. ¶¶ 24–29 (Count II), and seek damages for solatium, pain and suffering, and loss of consortium, *id.* ¶¶ 30–33 (Count III), as well as punitive damages, *id.* ¶¶ 34–37 (Count IV). All claims are brought under § 1605A(c), which creates a "[p]rivate right of action . . . for personal injury or death," and currently provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c).

Section 1605A(c) does not specify the substantive bases for liability that determine plaintiffs' entitlement to damages. Consequently, courts "may rely on well-established

17

statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see Estate of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 24, 29 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability); *see also Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi II*, 879 F. Supp. 2d at 54); *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 335 (D.D.C. 2014).

The plaintiffs rest their claim for damages on IIED. *See* Compl. ¶¶ 24–29 (Count II). The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26–27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)). All four plaintiffs are either mothers or siblings of the victims—plainly immediate family members. *See Fritz v. Islamic Republic of Iran* ("*Fritz II*"), 324 F. Supp. 3d 54, 63 (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting *Heiser II*, 659 F. Supp. 2d at 28)).

Defendant is liable for IIED to the four plaintiffs. In this case, because defendant materially supported Saudi Hezbollah, its conduct was "sufficiently outrageous and intended to inflict severe emotional harm upon a person who is not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834); *see Schooley*, 2019 U.S. Dist. LEXIS 108011, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at 37–38 (same). Finally, the plaintiffs have shown, through their uncontested declarations, that

they suffered significant emotional consequences from the attack, in the days spent waiting for news of their loved ones and in the years after the attack.[8]

### D.  Punitive Damages

In addition to compensatory damages and prejudgment interest, plaintiffs seek punitive damages, under § 1605A(c).  *See* Compl. ¶¶ 34–37; Pls.' Mot. at 2.  When plaintiffs filed this suit, awards of punitive damages "for conduct occurring prior to the [2008] enactment of § 1605A," were barred in the D.C. Circuit, *see Owens*, 864 F.3d at 818 (holding that Congress had not clearly authorized retroactive punitive damages awards), but the Supreme Court had granted certiorari to review the central question in *Owens, see Opati v. Republic of Sudan*, 139 S. Ct. 2771 (2019).  In May 2020, while plaintiffs were serving their Complaint, the Supreme Court ruled, in *Opati v. Republic of Sudan*, that Congress authorized plaintiffs suing under § 1605A(c) to seek punitive damages for pre-2008 conduct.  140 S. Ct. 1601, 1608–09 (2020).  After *Opati*, then, plaintiffs, who are proceeding under § 1605A(c), may seek punitive damages.  *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 251 (D.D.C. 2020) (concluding that plaintiffs suing for injuries from 1983 bombing were entitled to seek punitive damages after *Opati*); *Christie*, 2020 U.S. Dist. LEXIS 116378, at *65, *87–93 (awarding plaintiffs punitive damages for injuries from 1996 Khobar Towers bombing).

"[P]unitives are aimed not at compensation but principally at retribution and deterring harmful conduct."  *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008); *see also Opati*, 140 S. Ct. at 1609 ("[P]unitive damages aren't merely a form a compensation but a form of punishment . . .").  In line with these aims, in assessing whether punitive damages are warranted

---

[8]  *See* Edith Blank Decl. at 2–3 (attesting to emotional distress stemming from her experience as a result of the bombing); Cramblett Decl. ¶¶ 9, 11, 13 (same); Judith MacKenzie Decl. ¶¶ 6–9, 11–12, 16 (same); David MacKenzie Decl. ¶¶ 9, 12–13 (same).

under the FSIA's terrorism exception, one approach used in this Court is weighing four factors derived from general principles of tort law: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Oveissi II*, 879 F. Supp. 2d at 56 (quoting *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008)); *see* RESTATEMENT (SECOND) OF TORTS § 908 ("In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant."). Here, all four factors weigh in favor of awarding punitive damages: defendants aided Hezbollah in carrying out a horrific, violent attack that killed nineteen U.S. service-members and injured hundreds more; plaintiffs' family members were among those who suffered physical and other injuries, resulting in harm to plaintiffs themselves; there is a need to deter future terrorist attacks; and defendants, as state actors, can be presumed to possess significant wealth. *See Abedini v. Islamic Republic of Iran*, 422 F. Supp. 3d 118, 141 (D.D.C. 2019) (stating that these factors are used "[t]o determine whether punitive damages under the FSIA are warranted").

Once punitive damages are found to be warranted, the next task is to figure out the amount to be awarded. In putting a dollar figure on the amount of punitive damages to be awarded in state-sponsored terrorism cases, different approaches have emerged. One approach, "often used in exceptionally deadly attacks," *Doe v. Democratic People's Republic of Kor.*, No. 18-cv-0252 (DLF), 2021 U.S. Dist. LEXIS 34111, at *29 (D.D.C. Feb. 24, 2021), awards "punitive damages in the amount of three times . . . Iran's annual expenditure for terrorist activities," *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 34 (D.D.C. 1998); *see also Acosta*, 574 F. Supp. 2d at 31 (adopting this approach); *Valore v. Islamic Republic of Iran*, 700

F. Supp. 2d 52, 88–89 (D.D.C. 2010) (adopting this approach but with a multiplier of five). Another approach "calculate[s] the total compensatory damages awarded a victim," under the FSIA "and then multiplie[s] that award 'by a factor between one and five.'" *Fritz II*, 324 F. Supp. 3d at 65 (quoting *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 28 (D.D.C. 2017)). Yet, another approach awards "a flat $300 million" for punitive damages. *Abedini*, 422 F. Supp. 3d at 141 (noting this approach); *see Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 106 (D.D.C. 2012). Finally, a simpler, straight-forward approach, applied in *Christie*, awards punitive damages equal to compensatory damages. *See* 2020 U.S. Dist. LEXIS 116378, at *93; *Abedini*, 422 F. Supp. 3d at 142; *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 166–67 (D.D.C. 2017); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 73 (D.D.C. 2015). For the reasons explained *infra* Part III.E.2, the final method is adopted here.

### E.        Damages

Turning to the allowable damages, plaintiffs seek to recover solation, pain and suffering, loss of consortium and punitive damages. *See* Compl. ¶¶ 18–37; Pls.' Mot. at 2. To recover damages against foreign states under the FSIA's terrorism exception, plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain ([*i.e.*], more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Roth*, 78 F. Supp. 3d at 402 (alteration added) (internal quotation marks omitted); *see also Fraenkel*, 892 F.3d at 353 (stating the same). Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The damage award to which each plaintiff is entitled is described below.

Based on the evidence presented in *Blais* and *Heiser I*, of which this Court took judicial notice, this Court concluded in *Akins* that plaintiffs' family members injured in the Khobar Towers bombing suffered injuries that were "reasonably certain" and were the "intended consequences of the defendants' material support of Saudi Hezbollah," creating a "private right of action in Section 1605A(c)." *Akins*, 332 F. Supp. 3d at 39 (quoting *Fraenkel*, 892 F.3d at 353). Having concluded this, whether plaintiffs have shown the amount of solatium damages due by a reasonable estimate may be considered. *See* 28 U.S.C. § 1605A(c) (explicitly granting that "damages may include economic damages, solatium, pain and suffering, and punitive damages"). This finding also supports the conclusion that plaintiffs have satisfactorily shown that their injuries were reasonably certain and were the intended consequences of the defendants' material support of Saudi Hezbollah.

1. *Solatium*

The four plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of service-member victims. *See* Compl. ¶¶ 30–32. "Solatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society," *Fraenkel*, 892 F.3d at 356 (quoting *Flatow*, 999 F. Supp. at 29), but solatium damages have also been awarded to compensate for the emotional distress of the family members of surviving victims, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 39 (D.D.C. 2012) (explaining that "in the context of distress resulting from injury to loved ones—rather than death—courts have applied a framework where awards are valued at half of the awards to family members of the deceased." (internal quotation marks omitted)); *see also Valore*, 700 F. Supp. 2d at 85 ("Relatives of surviving servicemen received awards valued at half of the awards to family members of the deceased."). "Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Rep.*

22

*of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *see also Fraenkel*, 892 F.3d at 357.  Damages recoverable on the family members' claims of IIED thus will be discussed as claims for solatium damages.

"Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356–57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30).  In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

Commonly accepted in this Court is *Heiser*'s standardized framework for solatium damages. *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)). Although the *Heiser* framework is not mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."), it is adopted here for consistency, *see also Akins*, 332 F. Supp. 3d at 43 (adopting the *Heiser* framework for awarding solatium damages); *Schooley*, 2019 U.S. Dist. LEXIS 108011, at *309 (same); *Aceto*, 2020 U.S. Dist. LEXIS 22084, at *62–63 (same); *Christie*, 2020 U.S. Dist. LEXIS 116378, at *82 (same).

The *Heiser* framework, as a baseline, awards spouses of deceased victims $8,000,0000, parents and children of deceased victims $5,000,000, and siblings of deceased victims $2,500,000. *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 15 (D.D.C. 2010). "[F]amilies of victims who have died are typically awarded greater damages than families of victims who remain alive," *Heiser I*, 466 F. Supp. 2d at 269 (quoting *Haim v. Islamic Republic of*

*Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)), and so the courts have awarded family members of surviving victims approximately half the baseline awards for family members of the deceased, *see Wultz*, 864 F. Supp. 2d at 39; *Valore*, 700 F. Supp. 2d at 85. Here, then, the applicable baseline solatium awards are $2,500,000 to parents of surviving victims, *see Wultz*, 864 F. Supp. 2d at 39, and $1,250,000 for siblings of surviving victims, *see Valore*, 700 F.Supp.2d at 85.

These numbers serve only as an anchor from which the Court may deviate to compensate for specific circumstances. *See Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." (internal quotation marks omitted)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . ." *Oveissi v. Islamic Republic of Iran* ("*Oveissi I*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011); *see also Fraenkel*, 892 F.3d at 351 ("District Court judges have discretion . . . to grant solatium awards based on the particular facts of each case, subject to abuse-of-discretion review for errors of law, clearly erroneous factual findings, and faulty reasoning."). The damages awards for parents are addressed first, followed by siblings.

### a. Parents

Two plaintiffs will receive awards as parents of service members who were stationed at the Khobar Towers at the time of the bombing: Edith Blank and Judith MacKenzie. These mothers have attested to their panic upon learning about the attack and to the continued distress of witnessing their children deal with the psychological after-effects of the attack.[9] These harms

---

[9] *See* Edith Blank Decl. at 2–3; Judith MacKenzie Decl. ¶¶ 6–9, 11–12, 16.

are consistent with those suffered by many parents of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 16.

The parents of the injured service members are each entitled to a baseline award of $2,500,000. *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured service members). Where "a proposed solatium award would exceed the pain and suffering award received by a surviving victim," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014), however, a "proportional" downward deviation from the *Heiser I* framework is "appropriate," *Akins*, 332 F. Supp. 3d at 44; *see also Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011) (holding that it would be inappropriate for family members to receive a larger award than a service member). Applied here, plaintiff Edith Blank, whose service-member son Charles Blank was awarded the standard $5,000,000 baseline award in *Akins*, will receive an award of $2,500,000. Plaintiff Judith MacKenzie, whose service-member son Nicholas L. MacKenzie was awarded $2,500,000, a 50 percent downward departure from the applicable baseline, will receive an award of $1,250,000 in solatium damages, like the other parents of service-member victims who were awarded $2,500,000 in *Akins. See Akins*, 332 F. Supp. 3d at 44.[10]

---

[10] Plaintiffs argue that the damages awarded to Judith and David MacKenzie "should not be below the 'standard' of compensation adopted by the Court in . . . *Aceto, Christie,* and *Schooley*," arguing that these intervening cases demonstrate the standard in *Akins* has been "superseded" and so should not "artificially limit" the MacKenzie's awards. Pls.' Mem. at 11–12. Plaintiffs' argument relies on a misunderstanding of the *Heiser* framework and the basis for the awards granted in *Aceto, Christie,* and *Schooley*. First, awards to family-member claimants under the *Heiser* framework are relative to awards granted to the direct victims of terrorism because the reasoning underlying the framework identifies "the 'nature of the relationship' between the claimant and the victim," to be "a critical component in determining the appropriate award." *Oveissi I*, 768 F. Supp. 2d at 25–26 (quoting *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006)). Plaintiffs urge baseline awards to Judith and David MacKenzie because family-member plaintiffs in *Aceto, Christie,* and *Schooley* were awarded baseline awards, Pls.' Mot. at 12, without consideration of the relative departures in awards to their family members injured in the terrorist attack. Contrary to plaintiffs' characterization, the standard of compensatory awards in *Akins* was not "superseded" in subsequent cases but instead was supplemented with additional considerations for service-member plaintiffs who submitted VA disability ratings in support of their motion. Indeed, *Schooley* "applied the *Akins* rubric to fourteen service-member plaintiffs without VA disability ratings" while "defer[ring] to the standardized metric assigned by an agency with the expertise and responsibility to evaluate and distinguish between

## b. *Siblings*

The remaining two plaintiffs are siblings of service members stationed at the Khobar Towers at the time of the bombing: Christine Cramblett and David MacKenzie. Each has described experiencing distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[11] These harms are consistent with those suffered by many siblings of victims of terrorism. *See, e.g.*, *Christie*, 2020 U.S. Dist. LEXIS 11638, at *14–15, *18–19, *24–25; *Aceto*, 2020 U.S. Dist. LEXIS 22084, at *24–25, *32–34; *Schooley*, 2019 U.S. Dist. LEXIS 108011, at *16–17, *22–23, *45, *62–64. Plaintiff Christine Cramblett is entitled to an award of $1,250,000. Applying the proportional downward departure described in *Spencer*, 71 F. Supp. 3d at 28, plaintiff David MacKenzie is entitled to an award of $625,000. *Cf. Aceto*, 2020 U.S. Dist. LEXIS 22084, at *67 (applying downward departure to awards for plaintiff-parents, who had a $2,500,000 award baseline, where their service-member children were awarded $3,000,000 pain and suffering awards).

\*     \*     \*

In sum, the four plaintiffs in this action will be awarded a total of $5,625,000 in compensatory damages.

## 2. *Punitive Damages*

Punitive damages equal to compensatory damages will be awarded, as in *Christie*. The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1)

---

service-member injuries" to assess awards for service-member plaintiffs *with* VA disability ratings. *Akins v. Islamic Republic of Iran*, Civil Action No. 17-675 (BAH), 2021 U.S. Dist. LEXIS 132479, at *30–31 (D.D.C. July 16, 2012). Service member MacKenzie did not submit a VA disability rating in support of his claim in *Akins* and so does not qualify for assessment using a VA disability rating. *See Akins*, 332 F. Supp. 3d at 14–15; *see also Akins*, 2021 U.S. Dist. LEXIS 132479 at *27. Accordingly, Judith and David MacKenzie are neither "artificially limited or bound" by the standard applied in *Akins* nor entitled to "compensation applicable in post-*Akins* cases." Pls.' Mot at 12.

[11]      *See* Cramblett Decl. ¶¶ 9, 11, 13; David MacKenzie Decl. ¶¶ 9–10, 12–13.

the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). In addition, in *Philip Morris USA v. Williams*, the Supreme Court announced that "the Constitution's Due Process Clause forbids . . . use [of] a punitive damages award to punish a defendant for injury that it inflicts upon nonparties or those whom they directly represent, *i.e.*, injury that it inflicts upon those who are, essentially, strangers to the litigation." 549 U.S. 346, 353 (2007).

Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in the [other] methods" for determining punitive damages. *Christie*, 2020 U.S. Dist. LEXIS 116378, at *87. Specifically, *Christie* determined that this method avoided "a singular focus on deterrence," *id.* at *89, as well as "elevat[ing] superficial similarities over meaningful ones" and "skim[ing] over analysis of plaintiffs' precise harms," *id.* at *88–89, and does not "yield an excessive award," *id.* at *89. Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.* at *91, "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *93.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, the *Christie*'s punitive damages approach analysis also applies here. Accordingly,

a punitive damages award equal to compensatory damages is most appropriate. Plaintiffs are entitled to a punitive damages award of $ 5,625,500 to be apportioned among plaintiffs according to their compensatory damages. *Onsongo v. Republic of Sudan*, 60 F. Supp. 3d 144, 153 (D.D.C. 2014).

### F. Prejudgment Interest

All plaintiffs seek prejudgment interest on their damages awards. "Whether to award such interest is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi II*, 879 F. Supp. 2d at 58. "Prejudgment interest is an element of complete compensation," *West Virginia v. United States*, 479 U.S. 305, 310 (1987), and "is often necessary for full compensation," *Motion Picture Ass'n of Am. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992), where the plaintiff experiences a "delay in payment resulting from the litigation," *Oldham v. Korean Air Lines Co., Ltd.*, 127 F.3d 43, 54 (D.C. Cir. 1997). At the same time, the majority of Judges on this Court to consider the issue of prejudgment interest for FSIA damages awards have held "the 'values set by' the *Heiser* framework 'represent the appropriate level of compensation, regardless of the timing of the attack," *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (quoting *Oveissi I*, 768 F. Supp. 2d at 30 n.12), and that "pain and suffering and solatium damages are both designed to be fully compensatory," *id.* (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012)); *see also Doe v. Democratic People's Republic of Korea*, No. 18-cv-252 (DLF), 2021 U.S. Dist. LEXIS 34111, at *26 (D.D.C. Feb. 24, 2021) (denying prejudgment interest because the award "in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity") (Friedrich, J.); *Bathiard v. Islamic Republic of Iran*, Case Nos. 16-cv-1549 (CRC) & 17-cv-2006 (CRC), 2020 U.S. Dist. LEXIS 72513, at *23 (D.D.C. Apr. 24 2020) (Cooper, J.) (holding "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide

complete compensation"); *Cohen v. Islamic Republic of Iran*, Civil Action No. 17-1214 (JEB), 2019 U.S. Dist. LEXIS 115278, at *30 (D.D.C. Jul. 11, 2019) (Boasberg, J.) (denying prejudgment interest because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), *adopted by Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019) (Kollar-Kotelly, J.); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 54–55 (D.D.C. 2016) (Howell, J.).

Consistent with this persuasive authority, the four family-member plaintiffs are not entitled to prejudgment interest on their solatium damages. When denying prejudgment interest on solatium damages in *Oveissi I*, Judge Lamberth explained that "[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack." 768 F. Supp. 2d at 30 n.12; *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54. Indeed, solatium damages, and other nonpecuniary damages "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Id.* (quoting *Wyatt*, 908 F. Supp. 2d at 232). As in *Oveissi I*, where "the Court s[aw] no reason to deviate from its standard practice" of relying on "the values set by the [*Heiser*] scale[, which] represent the appropriate level of compensation" and award prejudgment interest, *Oveissi I*, 768 F. Supp. 3d at 30 n.12, the instant plaintiffs "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins*, 332 F. Supp. 3d at 46 (quoting *West Virginia*, 479 U.S. at 310).

Plaintiffs are likewise not entitled to prejudgment interest on their punitive damages. "Prejudgment interest does not apply to punitive damages because 'prejudgment interest is an

element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz*, 864 F. Supp. 2d at 42). Accordingly, plaintiffs are awarded monetary damages in the amounts established above, without prejudgment interest.

## IV.    CONCLUSION

The plaintiffs' motion for default judgment is granted in part and denied in part. Defendant is liable for the emotional distress inflicted on the four plaintiffs, each of whom are awarded monetary damages in the following amounts:

- Plaintiff-parent Edith Blank is entitled to an award of $2,500,000 in solatium damages and $2,500,000 in punitive damages;

- Plaintiff-parent Judith MacKenzie is entitled to an award of $1,250,000 in solatium damages and $1,250,000 in punitive damages;

- Plaintiff-sibling Christine Cramblett is entitled to $1,250,000 in solatium damages and $1,250,000 in punitive damages; and

- Plaintiff-sibling David MacKenzie is entitled to $625,000 in solatium damages and $625,000 in punitive damages.

Thus, the total damages award is $11,250,000.

An appropriate Order accompanies this Memorandum Opinion.


Date: July 17, 2021

                                              _____
                                              BERYL A. HOWELL
                                              Chief Judge